159 Wis.2d 358 (1990)
464 N.W.2d 79
MPI WISCONSIN MACHINING DIVISION, Petitioner-Respondent,
v.
State of Wisconsin DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Respondent-(in T. Ct.),
Dawn SCHIMMEL, Appellant.
No. 90-0844.
Court of Appeals of Wisconsin.
Oral argument October 29, 1990.
Decided November 27, 1990.
*362 On behalf of the appellant, the cause was submitted on the briefs of Susan Brehm and Helen Marks Dicks *363 and the oral argument of Susan Brehm of Center for Public Representation of Madison.
On behalf of the petitioner-respondent, the cause was submitted on the brief of Paul A. Hahn and Bonnie A. Wendorff and the oral argument of Paul A. Hahn of Boardman, Suhr, Curry & Field of Madison.
On behalf of the Wisconsin Education Association Council, the cause was submitted on the amicus curiae brief of Melissa A. Cherney, staff counsel, and Adam Henry Birnhak, associate counsel and the oral argument of Melissa A. Cherney of Madison.
Before Cane, P.J., LaRocque and Myse, JJ.
CANE, P.J.
Dawn Schimmel appeals a trial court judgment reversing the decision and order of a hearing examiner representing the Equal Rights Division of the Department of Industry, Labor and Human Relations. DILHR elected not to participate in this appeal. Schimmel contends the trial court erred by ruling that three incidents of illness involving Schimmel and members of her family were not "serious health conditions" within the meaning of the Family and Medical Leave Act (FMLA), sec. 103.10, Stats. Because Schimmel's absences to care for her daughter, KoHanna, and son, Brian, were medical leaves protected under the FMLA, we reverse the trial court's judgment.
Schimmel was discharged for accumulating twentyone points during a six-month period under the Absence and Lateness Policy of her employer, MPI Wisconsin Machining Division (MPI). Under MPI's policy,[1] an employee who leaves work early without prior approval is assessed two points, regardless of the reason for leaving. Also, an employee who is absent without prior *364 approval, but calls in on the day of absence, is assessed three points, regardless of the reason for the absence. When an employee accumulates twenty-one points within a six-month period, he or she is terminated.
On appeal, Schimmel contests the assessment of points for three absences in the six-month period. We will discuss the absences in the following order: (1) Dawn Schimmel was taken to a hospital emergency room, suffering from an attack of bronchitis. She was treated and released the same day, with instructions to return to work two days later. She was assessed three points for this violation. (2) Brian, Schimmel's son, had a mild concussion, and Schimmel left work early in response to a doctor's direction to take him to the hospital emergency room. She was assessed two points for this violation. (3) KoHanna, Schimmel's daughter, was hospitalized on a Sunday night for high fever and dehydration. Schimmel took the following day off work to care for KoHanna during her hospitalization, but called MPI within the policy's required notification period on the day of her absence. She was assessed three points for this violation.
The examiner, after a hearing authorized under sec. 103.10(12), Stats., determined that: (1) All three absences were "serious health conditions" within the meaning of the FMLA; (2) MPI violated the FMLA both by discharging Schimmel for taking protected leave and by adopting its Absence and Lateness Policy six months after the effective date of the FMLA, effectively chilling employees' rights under the Act;[2] and (3) the notice *365 requirements of sec. 103.10(6)(b), Stats., do not apply where leave is taken on an emergency basis. The examiner ordered Schimmel reinstated with back pay. The order also awarded Schimmel attorney fees and costs.
MPI sought judicial review of the examiner's decision and order. The trial court ruled that none of the three absences were "serious health conditions" and reversed the decision and order of the examiner. This ruling meant that the trial court never reached the issue of requisite notice of leave under the FMLA.

STANDARD OF REVIEW
[1]
The examiner's findings of fact will be upheld on appeal if supported by substantial evidence in the record. Section 227.57(6), Stats. The parties dispute the appropriate weight to be given to the examiner's conclusions of law. Schimmel contends that we should give "due weight" to an agency's determination of law where the agency applied its experience, technical competence or specialized knowledge to the decision. Section 227.57(10), Stats. MPI responds that an agency's conclusion of law is entitled to no deference in a case of first impression where the agency has developed no expertise in interpreting the statute, citing Drivers Local No. 695 v. LIRC, 154 Wis. 2d 75, 83-84, 452 N.W.2d 368, 372 (1990).
Neither standard, however, governs our review of an examiner's decision under the FMLA. Both refer to the deference owed a determination by an agency. The FMLA contains an unusual provision allowing direct appeal of an examiner's decision and order to the trial court, with no intervening review by a commission. See sec. 103.10(12), Stats. Compare sec. 111.39(5) (Fair Employment Act provides for review of examiner's findings *366 by Labor and Industry Review Commission prior to judicial review) and sec. 111.07(5), Stats. (any party in interest in an unfair labor practices controversy who is dissatisfied with the findings or order of a commissioner or examiner may file a written petition with the commission as a body to review the findings or order).
[2, 3]
Even were the Equal Rights Division examiners not facing an issue of first impression under this new statute, we would decline to extend greater deference to the conclusions of law of a single, unreviewed hearing examiner than we would to those of a trial court. The latter, of course, we review under a de novo standard, extending no deference to the trial court's conclusions. Quinn v. Town of Dodgeville, 120 Wis. 2d 304, 307, 354 N.W.2d 747, 749 (Ct. App. 1984), aff'd, 122 Wis. 2d 570, 364 N.W.2d 149 (1985). We conclude that the de novo standard is appropriately applied to conclusions of law by a single hearing examiner interpreting sec. 103.10, Stats.

STATUTORY CONSTRUCTION OF THE FMLA
The FMLA, enacted in 1988, provides various types of job-protected leave for Wisconsin workers. Only two categories are at issue in this appeal. The first category provides up to two weeks of unpaid leave during a twelve-month period if an employee has a serious health condition, sec. 103.10(4)(a) and (b), Stats.; the second category provides up to two weeks unpaid leave in a twelve-month period to care for the employee's child, spouse or parent with a serious health condition. Section 103.10(3)(a)2 and (b)3, Stats. A "serious health condition" is defined in the FMLA as follows:

*367 "Serious health condition" means a disabling physical or mental illness, injury, impairment or condition involving any of the following:
1. Inpatient care in a hospital, as defined in s. 50.33(2), nursing home, as defined in s. 50.01(3), or hospice.
2. Outpatient care that requires continuing treatment or supervision by a health care provider.
Section 103.10(1)(g), Stats. The trial court ruled that the terms "serious health condition" and "disabling" were ambiguous and indicated some reservation about the ambiguity of the phrase "continuing treatment or supervision by a health care provider."[3]
[4-7]
The construction of a statute is a question of law that this court reviews independently. Town of Sheboygan v. City of Sheboygan, 150 Wis. 2d 210, 212-13, 441 N.W.2d 752, 753 (Ct. App. 1989). A statute is ambiguous if it may be construed in different ways by reasonably well-informed persons. La Crosse Footwear v. LIRC, 147 Wis. 2d 419, 423, 434 N.W.2d 392, 394 (Ct. App. 1988). Whether a statute is ambiguous is a question of law. Sonnenburg v. Grohskopf, 144 Wis. 2d 62, 65, 422 N.W.2d 925, 926 (Ct. App. 1988). We are permitted to look beyond the statutory language and examine the scope, history, context, subject matter and object of the statute to discern legislative intent only if the statute is ambiguous. Sturgis v. Town of Neenah Bd. of Canvassers, 153 Wis. 2d 193, 198, 450 N.W.2d 481, 483 (Ct. App. 1989).
*368 The term "serious health condition" is defined in sec. 103.10(1)(g), Stats., as one that is: (1) a disabling physical or mental illness, injury, impairment or condition and (2) involves either inpatient care in a hospital or outpatient care that requires continuing treatment or supervision by a health care provider. Two components of this definition of "serious health condition" are ambiguous, and we address each in turn.
A. "Disabling"
[8]
The term "disabling" is ambiguous. It could be understood by reasonably well-informed persons to cover only long-term illnesses for which recovery is protracted, or to include any illness or injury that interferes with the performance of daily functions.
[9]
Absent legislative definition, the ordinary and accepted meaning of a word used by the legislature can be established by reference to a recognized dictionary. Goodger v. City of Delavan, 134 Wis.2d 348, 352, 396 N.W.2d 778, 780 (Ct. App. 1986). Webster's Third New Int'l Dictionary 642 (Unabr. 1976) defines "disabled" as "incapacitated by or as if by illness, injury, or wounds." It further defines "disability" to include "the condition of being disabled: deprivation or lack esp. of physical, intellectual, or emotional capacity or fitness . . . the inability to pursue an occupation or perform services for wages because of physical or mental impairment . . . a physical or mental illness, injury, or condition that incapacitates in any way." Id. It lists the word "weaken" as a synonym for the verb "disable." Id.
[10]
MPI contends that this broad dictionary definition of the term "disabling," which makes no reference to the *369 duration of a condition qualifying as "disabling," does not reflect legislative intent. It urges this court to consider two separate categories of legislative history to determine whether the legislature meant to cover only long-term illnesses for which recovery is protracted. First, it argues that a committee report on the federal FMLA of 1986,[4] which served as a model for the Wisconsin Act, should constitute persuasive authority as to the severity of conditions meant to be covered under this type of legislation. Both parties concede that this version of the federal FMLA was never passed, and that the most recent version of the federal FMLA was passed by both houses but vetoed by the President in early 1990. See McMillion, Family Leave Revived in Congress, ABA Journal 118 (Nov. 1990). We conclude that in this particular case, the legislative history of the bill never enacted should not serve as authority in interpreting an act of the Wisconsin legislature.
[11, 12]
Second, MPI argues that this court should consider notes in the Legislative Reference Bureau file on the FMLA written by the drafting attorney and a legislative aide to the bill's sponsor, Senator John Plewa.[5] The Wisconsin Supreme Court has held that a reviewing court gives weight to the written comments of those *370 involved in drafting the legislation, Robert Hansen Trucking v. LIRC, 126 Wis. 2d 323, 336, 377 N.W.2d 151, 157 (1985). The memorandum in Hansen, however, was written by the chair of the Council on Unemployment Compensation. Id. at 335, 377 N.W.2d at 156. The council submits recommendations to each regular session of the legislature with respect to amendments to unemployment compensation law. Id. at 335 n.7, 377 N.W.2d at 156 n.7. In the absence of additional documentary evidence that members of the legislature considered the comments of the drafting attorney or Plewa's legislative aide when adopting the FMLA, this court does not consider their comments persuasive evidence of legislative intent.
[13]
The Wisconsin legislature did not include any durational requirement in the statute to be met before a "serious health condition" was seen as "disabling." We conclude that the broader definition of "disabling" as found in the dictionary, which includes incapacitation, or the inability to pursue an occupation or perform services for wages because of physical or mental impairment,[6] more directly reflects legislative intent in enacting this protective statute.
The use of the broad dictionary definition does not make the word "disabling" mere surplusage. The dictionary definition could be used, for example, to distinguish an elective cosmetic surgery that entailed inpatient or outpatient care from a nonelective illness or injury.
B. "Continuing Treatment or Supervision By a Health Care Provider"
*371 [14]
We further conclude that the phrase "continuing treatment or supervision by a health care provider" is also ambiguous, as it could be understood to cover any outpatient care during which a health care provider provides instructions to the caretaker and instructs the caretaker to call if any problems develop, or to cover only outpatient care that requires follow-up care by a health care provider.
Schimmel provides us with a definition of "supervise" from The American Heritage Dictionary New College Edition 1292 (7th ed. 1978), "to direct and inspect the performance of (workers or work); oversee; superintend." She contends that continuing supervision does not require additional direct contact between the patient and health care provider beyond the initial outpatient contact. It is sufficient, in her view, that a doctor instruct a patient capable of self-care or another caretaking adult how to do follow-up care and remains available to respond to expected and unexpected problems. We disagree.
Webster's Third New Int'l Dictionary 2296 (Unabr. 1976) defines "supervision" as "the act, process, or occupation of supervising: direction, inspection, and critical evaluation: OVERSIGHT." (Emphasis added.) It defines "supervise" in part, as "to coordinate, direct, and inspect continuously and at first hand the accomplishment of: oversee with the powers of direction and decision the implementation of one's own or another's intentions." Id. (emphasis added).
[15]
This dictionary definition of supervision as direct, continuous and first-hand contact agrees with the interpretation of that word in another context by the Department of Health and Social Services. The department's *372 rules governing medical assistance programs, in effect since March 1, 1986, define the word supervision as follows: " `Supervision,' unless otherwise indicated . . . means at least intermittent face-to-face contact between supervisor and assistant and a regular review of the assistant's work by the supervisor." Wis. Adm. Code sec. HSS 101.03(173) (September 1990); see also Wis. Adm. Code sec. HSS 105.04 (June 1990) (supervision of provider assistants). We conclude that the term "continuing treatment or supervision by a health care provider" in the FMLA contemplates direct, continuous and first-hand contact by a health care provider subsequent to the initial outpatient contact.

WERE SCHIMMEL'S ABSENCES PROTECTED LEAVE?
[16]
Neither of the first two absences, one caused by Schimmel's own bronchitis, and the second by her son's mild concussion, involved an inpatient hospitalization. Therefore, in order to qualify as protected leave under sec. 103.10(1)(g)2, Stats., the absences must have been occasioned by a disabling illness that required outpatient care with continuing treatment or supervision by a health care provider.
[17]
Dawn Schimmel awoke at 4 a.m. on February 9 and experienced difficulty in breathing. Her sister took her to a hospital emergency room at 5:30 a.m. She called into work to report her absence within the time specified in MPI's policy. She was treated for bronchitis and released the same day, with instructions to return to work two days later. The record does not disclose how long she remained in the emergency room before her release. The treating physician instructed her to take medication for *373 the bronchitis four times a day. She was not told to return to a health care provider for a follow-up visit. Because Schimmel's illness did not call for outpatient care with continuing treatment or supervision by a health care provider, her absence on this occasion was not protected leave under the FMLA.
In the next situation, Brian, Schimmel's five-year-old son, fell one morning while Schimmel was preparing to go to work. Schimmel called her doctor when she observed her son acting strangely, and the doctor instructed her to keep the boy awake for the next hour and to notify him if the boy vomited. Schimmel took Brian and his brother to their baby-sitter and went to work at MPI. The baby-sitter called Schimmel at work and told her that Brian was falling asleep, vomiting and could not recognize his brother. Schimmel then left work and went to the baby-sitter's house. She called the doctor again, and he instructed her to take Brian to the emergency room. Schimmel complied, and the doctor kept him for observation in the emergency room until 1 p.m. The doctor provided Schimmel with an excuse for her employer written on a prescription pad, where he noted: "Brian had a head injury and was observed at Watertown Hospital during the day. Ms. Schimmel had to bring him to hospital and stay with him."
[18]
Schimmel contends that the approximately six hours during which Brian was kept under observation in the emergency room before his release amounted to continuing supervision or treatment.[7] We agree. This was a situation where her child suffered a concussion and later *374 exhibited symptoms indicative of a serious injury. It was only at this point that Schimmel left work and followed her doctor's advice to take her son to the hospital's emergency room for direct medical observation. Although the issue of whether an emergency room observation period amounts to continuing supervision will depend on the facts of a particular case, we are satisfied that the six-hour medical observation here constituted continuing treatment or supervision under the FMLA.
Schimmel's third contested absence involved inpatient hospitalization under sec. 103.10(1)(g)1, Stats. To qualify as protected leave under this section, the absence must have been occasioned by a disabling physical or mental illness, injury, impairment or condition that required inpatient care in a hospital. There is no requirement under this subsection of continuing treatment or supervision by a health care provider after the initial contact.
KoHanna, Schimmel's daughter, was hospitalized on a Sunday night for high fever and dehydration. Schimmel took the following day off work to care for KoHanna during her hospitalization, but called MPI within the policy's required notification period on the day of her absence.
MPI contends that the examiner's finding of fact that KoHanna was hospitalized on Sunday, January 29, and remained in the hospital until Monday, January 30, is not supported by substantial evidence in the record because: (1) Schimmel was confused as to dates of the hospitalization during her testimony and (2) Schimmel testified that she did not spend the entire day on Monday, January 30, in the hospital with KoHanna. The trial court, on the other hand, even though deciding that *375 KoHanna's illness was not a "serious health condition," allowed that "[t]he [examiner] might have inferred that KoHanna was admitted as an inpatient and did not spend the night in the emergency room, even though there is no such direct evidence. The finding would be supported by substantial evidence."
There is substantial evidence in the record to support the examiner's findings of overnight hospitalization. The doctor's note introduced as an exhibit at the hearing stated that KoHanna was "hospitalized for emergency treatment on 1/29/89." (Emphasis added.) Schimmel testified that KoHanna was hospitalized overnight. MPI's call-in log lists a call from Schimmel at 7:45 a.m. on Monday, January 30, indicating that she would be absent that day due to illness.
Schimmel admitted that she did not spend the entire second day with KoHanna in the hospital. Such an admission, however, does not lead to the conclusion that she did not miss work because she was caring for KoHanna on that day. Substantial evidence in the record supports a finding that Schimmel was absent from work on Monday, January 30, to care for KoHanna during her hospitalization.
[19]
We conclude as a matter of law that KoHanna, when hospitalized for high fever and dehydration, was suffering from a "serious health condition" within the meaning of the FMLA, and that MPI's Absence and Lateness Policy, which assessed points against Schimmel for her absence during a protected leave, violated sec. 103.10(11)(a), Stats.

*376 NOTICE REQUIREMENT
Two subsections of the FMLA deal with the question of the notice required in order to take the categories of leave at issue here. Section 103.10(4)(c), Stats., provides that: "An employee may schedule medical leave as medically necessary." Medical leave refers to that leave available when an employee personally experiences a serious health condition. Section 103.10(6)(b) provides: "If an employee intends to take family leave because of the planned medical treatment or supervision of a child, spouse or parent or intends to take medical leave because of the planned medical treatment or supervision of the employe, the employe shall do all of the following . . . ." (Emphasis added.)
[20]
The examiner concluded as a matter of law that these statutory subsections do not impose a notice requirement when leave is unplanned and unintended. We agree. The plain meaning of the statutory language is clear. If an employee suffers from a serious health condition (in the case of medical leave) or if an employee can establish that he or she took leave in order to care for a child, spouse or parent with a serious health condition (in the case of family leave) there is no statutory requirement of advance notice where such leave is unplanned and unintended. The statute allows the employer to require certification, sec. 103.10(7), Stats., to confirm that leave is taken only when a covered individual suffers from a serious health condition.
[21]
We reject MPI's contention that the FMLA sets up two categories of leave, one category being "less serious conditions" for which leave must be planned and scheduled in order to be protected, and the second category *377 "involving the most serious accidents or the most precipitous illnesses" where advance planning is not required. The issue of whether a particular illness or injury qualifies as a serious health condition is the threshold determination under the FMLA. Once made, statutory requirements of notice are the same for all categories of protected leave.
Judgment reversed and cause remanded, with directions to reinstate the decision and order of the examiner, as modified by our holdings.
By the Court.Judgment reversed and cause remanded, with directions.
NOTES
[1] MPI informed this court at oral argument that the policy was modified after the examiner's decision here.
[2] In view of our holding that Schimmel's discharge was a prohibited act under the FMLA, we do not address the examiner's alternative conclusion that MPI violated the Act by adopting its Absence and Lateness Policy six months after the effective date of the FMLA.
[3] The trial court noted that "`continuing supervision by a health care provider' is different from instructions to Mom to watch her child for certain symptoms or instructions or what to do when those symptoms present themselves."
[4] H.R. 99-699, Part 2, 99th Cong., 2d Sess. at 30-31 (1986).
[5] The trial court accorded these comments weight, including the legislative aide's understanding that the FMLA was not meant to cover "flu" and the drafting attorney's understanding that it was not meant to cover "a child's minor, but chronic condition." The trial court reasoned that Schimmel's daughter's illness, which started as the flu and progressed to high fever and severe dehydration was, therefore, not covered under the FMLA. We note that "flu" is a term that covers a variety of complications that can in rare instances cause death.
[6] In the case of an unemployed parent, spouse, or children, the incapacitation could take the form of interference with normal daily functions.
[7] At oral argument, Schimmel modified her earlier contention that the monitoring of Brian after his release from the hospital, with instructions from the doctor to call him if there were any problems, was sufficient to demonstrate continuing supervision by a health care provider. We conclude that such monitoring does not amount to continuing supervision under the FMLA.