Audrey M. SEIDLE

v.

**PROVIDENT MUTUAL LIFE
INSURANCE COMPANY.**

Civ. A. No. 94–3306.

United States District Court,
E.D. Pennsylvania.

Dec. 20, 1994.

Robert T. Murphy, Debra A. Jensen, Galfand, Berger, Lurie, Brigham and March, Philadelphia, PA, for Audrey M. Seidle.

Deidre A. Grossman, Joseph J. Costello, Morgan, Lewis and Bockius, Philadelphia, PA, for Provident Mut. Life Ins. Co.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

The plaintiff brought this action, claiming that her termination by the defendant following her four-day absence from work violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, because her absence had been occasioned by the need to care for her ill, four-year old son, Terrance Johnson ("Terrance"). Plaintiff seeks back pay from the date of her discharge, reinstatement or front pay, and other remedies available under the FMLA. Presently before the court are the parties cross-motions for summary judgment on the limited issue of whether Terrance's illness constitutes a "serious health condition" within the meaning of the FMLA.[1] For the reasons which follow, the motion of the defendant is granted and the motion of the plaintiff is denied.

### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340–41 (3d Cir.1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91

L.Ed.2d 202 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). To establish a genuine issue of material fact, the non-moving party must introduce evidence beyond the mere pleadings to create an issue of material fact on "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden of demonstrating the absence of genuine issues of material fact is initially on the moving party regardless of which party would have the burden of persuasion at trial. *First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins.*, 824 F.2d 277, 280 (3d Cir. 1987). Following such a showing, the non-moving party must present evidence through affidavits or depositions and admissions on file which comprise of a showing sufficient to establish the existence of every element essential to that party's case. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. If that evidence is, however, " 'merely colorable' or is 'not significantly probative', summary judgment may be granted." *Equimark Commercial Finance Co. v. C.I.T. Financial Corp.*, 812 F.2d 141, 144 (3d Cir.1987) (quoting, in part, *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

### FACTS

The following facts concerning the narrow issue of whether Terrance's illness constitutes a "serious health condition" under the FMLA are undisputed:[2]

---

1. The parties agree that if the Court finds that Terrance's illness did not constitute a "serious health condition" within the meaning of the FMLA, plaintiff would not be entitled to the protection of the FMLA. The parties also agree that if the Court concludes that Terrance's illness was a "serious health condition" within the meaning of the FMLA, the parties will have to pursue a number of other issues, including whether plaintiff was "needed to care" for her son within the meaning of the FMLA.

2. Plaintiff states on the very first page of her motion for summary judgment that "[t]here are no genuine issues of material fact relating to whether the Plaintiff's son had a 'serious health condition' within the meaning of the Act and the implementing regulations, permitting the entry of judgment for the Plaintiff." Yet, plaintiff also states on the very first page of her response to

defendant's motion for summary judgment that "[t]here are genuine issue of material fact in this matter, preventing the entry of judgment for the Defendant." Apparently, plaintiff finds material facts in dispute only to avoid the entry of summary judgment against her, but conveniently does not find material facts in dispute when she seeks summary judgment to be entered in her favor. In any event, the Court has determined from a careful review of the entire record that there are no genuine issues as to any material fact concerning the narrow issue of whether Terrance's illness constitutes a "serious health condition" under the FMLA. Although plaintiff has submitted affidavits of Joseph J. Levinsky, M.D. and Max L. Ronis, M.D., M.S., these affidavits do not contain any additional facts concerning Terrance's illness but offer only expert opinions on the ultimate legal issue of whether Terrance's illness constitutes a "serious health condition".

At the time she was terminated, plaintiff worked as a Claims Examiner at defendant's subsidiary in Newark, Delaware. Deposition of Audrey Seidle ("Seidle Dep.") at 61. Plaintiff did not report to work on Monday, October 11, 1993, Tuesday, October 12, 1993, Wednesday, October 13, 1993, Thursday, October 14, 1993 and Friday, October 15, 1993. *Id.* at 75. When plaintiff returned to work on Monday, October 18, 1993, she was informed she was being terminated due to excessive absenteeism. *Id.* at 129. On October 11, plaintiff was given an excused personal day off. *Id.* at 82. Plaintiff alleges it was necessary for her to take the remaining four days off to care of Terrance.

The facts concerning Terrance's illness are as follows: On October 11th, between 11:30 p.m. and 12:00 a.m., Terrance awoke from his sleep and began to vomit and experience symptoms of fever and a runny nose. *Id.* at 83. His temperature at that time was "about 100°". *Id.* at 84. Plaintiff gave Terrance "some Tylenol" which Terrance also vomited. *Id.* On October 12, 1993, at approximately 2:00 a.m., Terrance's temperature had risen to 102°. *Id.* at 85. At 2:00 a.m., plaintiff phoned the office of Terrance's pediatrician, Patricia Camody–Johnston, M.D., F.A.A.P. ("Dr. Johnston"). *Id.* Plaintiff described Terrance's condition to "Donna" who answered the phone. *Id.* at 86.[3] Donna instructed plaintiff to monitor Terrance's temperature, continue to administer Tylenol and, if his condition did not improve overnight, to bring him in to see Dr. Johnston. *Id.* Donna did not direct plaintiff to take Terrance to either an emergency room or a hospital. *Id.* at 87. At 6:00 a.m., Terrance's temperature had dropped to 100°. *Id.* at 88. Plaintiff subsequently scheduled an appointment for Terrance to see Dr. Johnston around 2:00 or 3:00 p.m. on October 12th. *Id.* at 96. At no time did Terrance complain about any ear pain. *Id.* at 86.

Dr. Johnston examined Terrance in her office for about 20 minutes. *Id.* at 100. At the time of the examination, Terrance had a temperature of 99.8°. Notes of Dr. Johnston

included in the Appendix to plaintiff's Motion for Summary Judgment as Exhibit B. Dr. Johnston diagnosed Terrance as suffering from a "right otitis media" or "ROM". *Id.*; Letter dated March 30, 1994 from Dr. Johnston to plaintiff's attorney included in the Appendix to Plaintiff's Motion for Summary Judgment as Exhibit C. Dr. Johnston prescribed an oral antibiotic (Amoxicillin) to be taken by Terrance twice a day over a full ten day period. *Id.*; Notes of Dr. Johnston; Seidle Dep. at 23, 100, 102. Dr. Johnston did not prescribe any ear drops. *Id.* at 101. Nor did she recommend taking Terrance to an emergency room or hospital. *Id.* Dr. Johnston requested that plaintiff bring Terrance back in two weeks to ensure that the ear infection had been resolved. Exhibits B, C. Dr. Johnston also told plaintiff to keep Terrance home for two days and to monitor his temperature. Seidle Dep. at 101. Indeed, it is Dr. Johnston's "usual advice to a parent with a child with an ear infection that the child not return to day care or other prearranged baby sitting situation and remain home until the child has no more fever for at least 48 hours and feels better." Exhibit C.

By late in the evening on October 12, 1994, Terrance's fever had disappeared. *Id.* at 107. Nor did he have a fever for the rest of the week. *Id.* at 108. Terrance did not eat any food that evening. *Id.* He did not vomit and did not complain about any pain in his ear. *Id.* He slept soundly that evening. *Id.*

On the morning of October 13, 1993, Terrance did not eat anything for breakfast but did drink a little juice. *Id.* at 110. Plaintiff did not take Terrance to his day care center that day. *Id.* at 111–112. Instead, Terrance remained inside all day either dozing or watching TV. *Id.* Terrance did not eat any lunch or dinner. *Id.* He just drank a little juice. *Id.* He continued to take Amoxicillin along with Tylenol and Pediacare, a non-prescription medication for children. *Id.* Terrance again slept soundly that night. *Id.*

---

For reasons stated *infra*, the court rejects these affidavits.

**3.** The professional status of "Donna" is unclear. Plaintiff testified that "Donna" wears a white uniform and "works at the desk". *Id.* at 95.

On the morning of October 14, 1993, Terrance ate a couple of spoonfuls of cereal for breakfast. *Id.* at 114. Terrance continued to take Amoxicillin and Pediacare, but did not take any Tylenol. *Id.* Plaintiff did not take Terrance to the day care center that day. *Id.* Terrance remained inside all day. *Id.* Terrance did not eat any lunch that day but did eat some "chicken nuggets and fries" for dinner. *Id.* at 115. Terrance once again slept soundly that night. *Id.*

On the morning of October 15, 1993, Terrance ate a "couple spoonfuls of cereal" for breakfast. *Id.* at 118. Terrance did not eat lunch and ate "[j]ust a little" for dinner. *Id.* at 118. Plaintiff continued to give Terrance Amoxicillin and Pediacare that day. *Id.* Plaintiff did not report to work that day because "Terrance still had a runny nose and the day care would not allow him to be there." *Id.* at 117, 128. Terrance remained inside all day. *Id.* at 119. He spent most of the day either watching TV or napping. *Id.* He once again slept soundly that night. *Id.*

On the morning of October 16, 1993, Terrance ate a "little" for breakfast, lunch and dinner. *Id.* at 120. Terrance started playing with his toys "a little more" and started talking "a little more." *Id.* He also went with his mother to the supermarket for about 45 minutes. *Id.* Plaintiff continued to give Terrance Amoxicillin and Pediacare that day. *Id.* at 121. Terrance once again slept soundly that night. *Id.*

On the morning of October 17, 1993, plaintiff thought Terrance was feeling better since he was playing and talking "a little bit more." *Id.* at 122. He ate waffles for breakfast, nothing for lunch and chicken and rice for dinner. *Id.* Plaintiff continued to give Terrance Amoxicillin. *Id.* at 124. Terrance stayed inside all day. *Id.* His runny nose "started to dry up" late that day. *Id.* at 123. He again slept soundly that night. *Id.*

On the morning of October 18, 1993, plaintiff took Terrance to the day care center. *Id.* Plaintiff also returned to work that day. *Id.* Plaintiff gave Terrance Amoxicillin in the morning and again in the evening. *Id.* at 125.

Terrance had never had an ear infection prior to October, 1993 and has not had one since. *Id.* at 126–127. Other than the October 13 visit, plaintiff had no further communications, either in person or by telephone, with Dr. Johnston or any other health care provider regarding Terrance's ear infection. *Id.* at 103–104. Plaintiff never took Terrance back to Dr. Johnston for a follow-up examination concerning his ear infection. *Id.* at 103, 135. The next time Dr. Johnston examined Terrance was on December 17, 1993 for an unrelated illness. Exhibit B.

*STATUTORY CONSTRUCTION OF THE FMLA*

To support its decision to pass the FMLA, Congress made six Findings, three of which are relevant to the case *sub judice:*

(2) it is important for the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members who have serious health conditions;

(3) the lack of employment policies to accommodate working parents can force individuals to choose between job security and parenting;

(5) due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men;
. . .

FMLA § 2(a)(2), (3), (5), 29 U.S.C. § 2601(a)(2), (3), (5).

Congress has stated that the purposes of the FMLA include the following:

(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition; . . .

FMLA § 2(b)(1), (2), 29 U.S.C. § 2601(b)(1), (2).

Under the FMLA, an eligible employee will be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

FMLA § 102, 29 U.S.C. § 2612. In addition, any eligible employee who takes leave under section 102 of the FMLA is entitled, on return from such leave, "to be restored" ... to the position of employment held by the employee when the leave commenced[.] FMLA § 104(a)(1)(A), 29 U.S.C. § 2614(a)(1)(A).

■ In the case *sub judice*, plaintiff alleges that her four-day leave of absence from October 12–15, 1993 was occasioned by the "serious health condition" of her son and, therefore, claims her leave of absence was permitted by section 102(a)(1)(C). As a result, the narrow issue for us to determine is whether Terrance's ear infection (right otitis media) qualifies as a "serious health condition". The FMLA defines a "serious health condition" as:

... an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.

FMLA § 101(11), 29 U.S.C. § 2611. Because this definition is somewhat ambiguous [4] and there is as of yet no body of common law to provide guidance, we turn to the legislative history of the FMLA for guidance. The legislative history states that examples of "serious health conditions" include but are not limited to the following:

heart attacks, heart conditions requiring heart bypass of valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth.

H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993); U.S.Code Cong. & Admin.News 1993 at pp. 3, 31; *See also,* 58 Fed.Reg. 31,799 (1993). According to Congress, it is these types of illnesses which "meet the general test that either the underlying health condition of the treatment for it requires that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery." *Id.* Similarly, with respect to children, "serious health condition" is intended "to cover conditions or illnesses that affect the health of the child, spouse or parent such that he or she is similarly unable to participate in school or in his or her regular daily activities." *Id.* at 28. On the other hand, Congress sought to exempt those "minor illnesses which last only a few days and surgical procedures which typically do not require hospitalization and require only a brief recovery period." *Id.* According to Congress, these illnesses should be covered by the employer's sick leave policy. *Id.*

Conspicuously absent from the list of examples contained in the legislative history are ear infections (otitis media). Although Congress stated that the list of examples of serious health conditions was not intended to be exhaustive, an ear infection of the type suffered by Terrance certainly is not as severe as any of the illnesses listed above. After all, Terrance's fever lasted no more than 24 hours. Treatment of the ear infec-

---

**4.** For example, "continuing treatment by a health care provider" could refer to outpatient care that requires follow-up care by the provider or it could refer to outpatient care where the provider merely provides instructions to the caretaker.

tion essentially consisted of one 20 minute examination by his pediatrician and a 10–day regimen of consuming an antibiotic. At no time, did Terrance complain of any ear pain. The ear infection did not require any hospitalization or surgical intervention. Therefore, Terrance's ear infection appears to resemble a "minor illness which lasts only a few days." We need, however, to inquire further.

## DEPARTMENT OF LABOR REGULATIONS

The Department of Labor, pursuant to Section 404 of the FMLA, has prescribed substantive regulations ("the Regulations") which, *inter alia*, further expound on the meaning of "serious health condition". The Regulations state, in pertinent part:

What is a "serious health condition"?

(a) For purposes of FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:

(1) Any period of incapacity or treatment in connection with or consequent to inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility;

(2) Any period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider; or

(3) Continuing treatment by (or under the supervision of) a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days; or for prenatal care.

(b) "Continuing treatment by a health care provider" means one or more of the following:

(1) The employee or family member in question is treated two or more times for an injury or illness by a health care provider. Normally, this would require visits to the health care provider or to a nurse or physician's assistant under direct supervision of the health care provider.

(2) The employee or family member is treated for the injury or illness two or more times by a provider of health care services (e.g. physical therapist) under orders of, or on referral by, a health care provider, or is treated for the injury or illness by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider—for example, a course of medication or therapy—to resolve the health condition.

(3) The employee or family member is under the continuing supervision of, but not necessarily being actively treated by, a health care provider due to a serious long-term or chronic condition or disability which cannot be cured. Examples include persons with Alzheimer's, persons who have suffered a severe stroke, or persons in the terminal stages of a disease who may not be receiving active medical treatment.

29 C.F.R. § 825.114

## DID TERRANCE HAVE A "SERIOUS HEALTH CONDITION" FROM OCTOBER 12–15, 1993?

Plaintiff claims that Terrance had a "serious health condition" under § 825.114(a)(2). That section requires that Terrance both undergo a period of incapacity requiring absence from his day care center for *more than* three days and be under the continuing treatment of a physician. Unfortunately for plaintiff, she cannot establish either prong.

First, although Terrance did not attend his day-care center for four calendar days (October 12–15), his incapacity (otitis media) required him to be absent for only three calendar days. Terrance was absent from his day-care center on October 12, 1994 because that was the day his condition was the worst and was the day he was examined by Dr. Johnston. Terrance did not attend his day care center on October 13th and 14th at the suggestion of Dr. Johnston who told plaintiff that she should keep Terrance home for two days. This suggestion coincided with Dr. Johnston's usual advice to a parent of a child with an ear infection to keep the child home until he is free of fever for 48 hours. As of

the evening of October 14th, Terrance had been free of fever for 48 hours. Therefore, Terrance should have been able to attend his day-care center on October 15th. However, plaintiff herself testified that Terrance did not attend his day care center on the fourth day, October 15th, because of the day-care center's policy prohibiting children with a "runny nose" from attending. There is no evidence that Terrance had more than a runny nose on October 15, 1993. A runny nose can hardly be classified as an incapacity. Nor does the fact that Terrance may have been "listless" and without a good appetite on October 15th make him incapacitated. Therefore, Terrance was not absent from his day-care center for *more than* three days because of an incapacity.

Even if the evidence can be construed as demonstrating that Terrance was absent from his day-care center for *more than* three days because of an incapacity, the evidence does not show that the period of incapacity involved "continuing treatment by (or under the supervision of) a health care provider" as that phase is defined in the Regulations.

Plaintiff cannot meet the definition of "continuing treatment by a health care provider" contained in § 825.114(b)(1) since Terrance was treated on just one occasion by Dr. Johnston on October 12, 1993.[5] For this same reason, plaintiff also cannot meet the first part of the definition contained in § 825.114(b)(2). Plaintiff, however, contends that she has met the alternative definition contained in § 825.114(b)(2)—that Terrance was treated for an illness by a health care provider on at least one occasion which result[ed] in a regimen of continuing treatment under the supervision of the health care provider—for example, a course of medication or therapy—to resolve the health condition.

5. Plaintiff argues that Terrance was treated two or more times by a health care provider based on what she terms "three physician contacts"—the "telephone consultation" with "Donna" at 2:00 a.m. on October 12, 1993, Dr. Johnston's examination of Terrance on October 12, 1993 and the "recommended return visit within two weeks." The plain language of the Regulations, however, speaks only of actual treatments, not "contacts" such as telephone consultations or recommended

As noted above, Terrance was indeed treated by Dr. Johnston on one occasion. Dr. Johnston also prescribed Amoxicillin and directed plaintiff to administer the antibiotic to Terrance for a period of ten days. However, at no time did Terrance take the medication under the *continuing supervision* of Dr. Johnston. The undisputed record reveals that following Terrance's examination by Dr. Johnston on October 12th, Terrance had no further contact with Dr. Johnston either in person *or by telephone.* Although Dr. Johnston instructed plaintiff to bring Terrance back for a follow-up examination in two weeks to ensure that the ear infection had been resolved, plaintiff never scheduled such an examination or even communicated with Dr. Johnston's office by telephone. Instead, it was plaintiff, with no continuing supervision from Dr. Johnston, who administered and supervised Terrance's course of medication. Thus, we conclude that Terrance did not undergo continuing treatment by a health care provider. *See, e.g., MPI Wisconsin Machining Division v. State of Wisconsin, Dept. of Industry,* 159 Wis.2d 358, 464 N.W.2d 79, 84 (1990) ("the term 'continuing treatment or supervision by a health care provider' in the FMLA contemplates direct, continuous and first-hand contact by a health care provider subsequent to the initial outpatient contact.") (interpreting similar state FMLA statute).

In arguing that Terrance's ear infection does constitute a "serious health condition", plaintiff relies heavily on the affidavits of Joseph J. Levinsky, M.D. and Max L. Ronis, M.D., M.S. which plaintiff has included in the Appendix to her motion for summary judgment as Exhibits D and F. Plaintiff states that these affidavits contain the expert opinions of the affiants as to the nature of otitis media, its causes, its seriousness and its potential sequelae and are admissible under Rule 702 of the Federal rules of Evidence.[6]

visits. The record is undisputed that the only time Terrance was actually treated and examined by Dr. Johnston was on October 12, 1993.

6. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,

In his affidavit, Dr. Levinsky avers that he is a Staff Physician in the Department of Emergency Medicine at Burlington County Memorial Hospital, Burlington County, New Jersey. Dr. Levinsky avers that as part of his emergency medicine practice, he evaluates children with diseases such as otitis media. According to Dr. Levinsky, the symptoms of otitis media usually include a feeling of fullness in the ear, followed by a severe stabbing pain which often prevents sleep and other activities. Dr. Levinsky avers that untreated ear infections can result in the production of pressure in the middle ear which may eventually burst the eardrum. Even with treatment, avers Dr. Levinsky, "a patient's symptoms must be carefully monitored to determine whether the patient is responding to the prescribed medication." Dr. Levinsky avers that improperly monitored ear infections, especially those in young children, can lead to bacterial meningitis which itself may cause deafness, brain damage or death. Improperly treated ear infections can also become chronic and lead to a loss of hearing. Thus, avers Dr. Levinsky, it is "critical to promptly treat otitis media and monitor a patient's condition after diagnosis."

Dr. Levinsky also avers that he reviewed Dr. Johnston's medical records relating to the examination and treatment of Terrance as well as her letter to plaintiff's attorney dated march 30, 1994. Dr. Levinsky avers that the regimen of Amoxicillin prescribed by Dr. Johnston must last 10 days and that it was important for plaintiff to monitor Terrance's condition "during the days following onset." Dr. Levinsky also averred that Dr. Johnston's recommendation to keep Terrance out of day care for at least 48 hours following the disappearance of his fever followed standard medical protocol. In conclusion, Dr. Levinsky avers that Terrance was diagnosed to have otitis media, "a serious medical condition requiring treatment with antibiotics and monitoring by his mother to prevent the development of sequelae such as mastoiditis and/or meningitis, which are capable of causing long term disability or even death."

In his affidavit, Dr. Ronis avers that he is an Otolaryngologist, specializing in the diagnosis and treatment of diseases of the ear and larynx of children. Dr. Ronis avers that otitis media is a "common but serious condition" which "must be treated promptly after diagnosis because of its potential to produce sequelae that become or may be fatal." Like Dr. Levinsky, Dr. Ronis avers that the symptoms of otitis media include intermittent or continuous pain and, in children, difficulty with sleep and normal childhood activities. Dr. Ronis also avers that "the patient's progress must be carefully observed." According to Dr. Ronis, "[i]f there is not significant improvement in fever and pain after seventy two hours, the patient must be reevaluated to determine whether any secondary condition like meningitis is complicating recovery and whether the treatment plan requires modification." Dr. Ronis further avers that "[p]ersistent monitoring of otitis media in young children is highly recommended because of the risks associated with the development of meningitis and hearing loss." Finally, Dr. Ronis avers that he advises parents of children with otitis media to "keep the child at home if possible, and monitor progress persistently until the child is eating, playing and socializing appropriately."

Although we have no difficulty finding that Dr. Levinsky and Dr. Ronis are experts on the nature of otitis media, we nevertheless reject the opinions and conclusions contained in their affidavits for a number of reasons. First, neither Dr. Levinsky nor Dr. Ronis examined or treated Terrance at the time he suffered from otitis media. Although Rule 703 of the Federal Rules of Evidence does permit an expert a wide range of latitude to offer opinions, including those that are not based on first-hand knowledge or observation, the fact remains that both physicians aver in their affidavits that the symptoms of otitis media *in general* include a feeling of fullness in the ear accompanied by pain and difficulty sleeping whereas plaintiff herself testified that at no time did Terrance complain of pain in his ear and that Terrance had difficulty sleeping only on the night of October 11th. The closest Dr. Levinsky came to treating or examining Terrance was his perusal of Dr. Johnston's medical notes con-

may testify thereto in the form of an opinion or otherwise.

cerning *her* treatment of Terrance. However, even after reading Dr. Johnston's notes, Dr. Levinsky merely confirmed that Dr. Johnston followed standard medical protocol in prescribing Amoxicillin and in recommending that Terrance be kept home from day care and monitored by plaintiff until he was free of fever for 48 hours. He did not aver that Terrance had a particularly inflamed otitis media or any symptoms which could lead to mastoidis and/or meningitis or that he should be kept home for more than 48 hours after his fever disappeared.

Second, while we understand that plaintiff submitted the affidavits to assist the Court in understanding what plaintiff terms the serious nature of otitis media, the opinions of Dr. Levinsky and Dr. Ronis that otitis media *in general* is a "serious medical condition" are *medical* opinions. However, the only issue before this Court is whether the particular otitis media suffered by Terrance constitutes a "serious health condition" *as defined legally by the FMLA and its implementing regulations, not as defined by the medical community.* As noted above, an analysis of Terrance's otitis media under the FMLA and its implementing regulations reveals that it is not a "serious health condition."

Third, the physicians' opinions that otitis media is a "serious medical condition" are based largely on the *potential* dangers of otitis media, especially if left untreated. However, the FMLA and its implementing regulations defining "serious health condition" are not concerned with the *potential* dangers of an illness but only with the *present* state of that illness. *See* 29 U.S.C. 2611(11) ("The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that *involves* " continuing treatment by a health care provider.); 29 C.F.R. § 825.114 ("For purposes of FMLA, 'serious health condition' means an illness, injury, impairment, or physical or mental condition that *involves* " a three-day period of incapacity and continuing treatment by a health care provider.)

As pointed out by defendant its reply memorandum, "[t]o construe the FMLA to include conditions which, although minor in their initial stages, could evolve into serious illnesses would bring within the protections of the statute virtually every common malady, an out come which is in direct conflict with Congress' intention to exclude from the protections of the FMLA those minor illnesses with short recovery periods." Reply Memorandum at 10. "For example, a cut on a finger, a skinned knee or a common cold, if no cared for properly, could develop into something far more serious; yet no one would argue that Congress intended to cover such minor conditions under the FMLA." *Id.* It is such minor conditions that Congress believed should be covered under the employer's sick leave policy.

Of course, had Terrance actually been suffering from mastoiditis and/or meningitis or even chronic otitis media *during the period October 12–15, 1993,* we would have little difficulty finding that he suffered from a "serious health condition". However, the unrefuted record reveals that Terrance had never had otitis media before and that he suffered from the most common form on this occasion. He never complained of any ear pain in the infected ear. He did not have to be seen in an emergency room. In addition, the condition began to clear up as soon as he began his regimen of Amoxicillin on October 12th.

In conclusion, we find that Terrance did not have a "serious medical condition" from October 12–15, 1993 as defined by Congress in the FMLA and by the Department of Labor in the Regulations. No matter where our sympathies may lie, the Court is duty bound to carry out the edict of the FMLA as mandated by Congress. Accordingly, plaintiff is not entitled to the protection of the FMLA and her termination by the defendant did not violate the FMLA.

### ORDER

The motion of the plaintiff for partial summary judgment is DENIED.

The motion of the defendant for summary judgment is GRANTED.

Judgment is ENTERED in favor of the defendant Provident Mutual Life Insurance

Company and against the plaintiff Audrey M. Seidle.

IT IS SO ORDERED.