# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2382

_____

Juanita Caldwell,       *

     *

     Plaintiff - Appellant,      *

     *    Appeal from the United States

     v.      *    District Court for the

     *    Western District of Arkansas.

Holland of Texas, Incorporated, doing      *

business as Kentucky Fried Chicken,      *

     *

     Defendant - Appellee.      *

_____

Submitted: January 13, 2000
Filed: March 30, 2000

_____

Before RICHARD S. ARNOLD, BRIGHT and HANSEN, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Juanita Caldwell ("Caldwell") appeals the district court's grant of summary judgment to her former employer, Holland of Texas, Inc. ("Holland"), on her claim that Holland terminated her employment in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2611-2612. The district court determined as a legal matter that Caldwell's son did not suffer a "serious health condition" under the FMLA, and therefore, the FMLA does not give her any benefits. We determine that Caldwell's evidence showing that her three-year-old son sustained a sudden onset of an ear infection — a condition that required immediate attention by a physician, a series of

antibiotic treatments, and surgery — is sufficient to present a fact question regarding whether Caldwell's son's illness and disability qualifies as a "serious health condition" entitling the employee to FMLA leave. Accordingly, we reverse and remand.

## I.    BACKGROUND

Caldwell is a single mother, working to support herself and her three-year-old son, Kejuan. Before she was summarily fired, Caldwell worked for Holland, which owns and operates several Kentucky Fried Chicken restaurants in Texarkana, Arkansas. Caldwell worked for Holland for three years, and during that time, she developed an excellent record working at the Kentucky Fried Chicken on Hickory Street.

On Saturday, June 7, 1997,[1] Kejuan awoke with a high fever, pain in his ears, and congestion. Caldwell promptly notified Assistant Manager Loyce, prior to the start of her morning shift, that she would be absent because Kejuan required immediate medical attention. Loyce gave Caldwell permission to miss her shift. That morning, a doctor at an emergency clinic diagnosed Kejuan as having an acute ear infection. During this visit, the doctor prescribed a ten-day course of antibiotics and a two-day decongestant for Kejuan. At the same time, the treating physician informed Caldwell that her son's condition probably would require surgery if her son was to avoid

---

[1]There is a slight discrepancy in the record regarding the date of Kejuan's first visit to treat his ear infection: the medical record of his first visit shows a date of June 6, 1997 instead of June 7, 1997, the date presented by appellant. We nevertheless rely on the affidavit of the plaintiff for purposes of summary judgment. See Pace v. City of Des Moines, No. 99-1423, 2000 WL 31713 at *1 (8th Cir. Jan. 13, 2000) ("Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.").

permanent hearing loss, and he recommended that Caldwell schedule a follow-up examination with her son's regular pediatrician, Dr. Mark Wright.

Later that Saturday night, upon the request of an assistant manager, Caldwell worked an evening shift at one of Holland's other restaurant locations. While Caldwell was working, her elderly mother cared for her son and administered his medications. Caldwell did not have any shifts on Sunday. When Caldwell returned to her regular work on Monday morning, June 9, 1997, Mark Monholland, a manager at the Hickory Street restaurant, abruptly fired Caldwell without discussing her absence of June 7, 1997.

The supplemental affidavit of Ms. Caldwell, Kejuan's mother, asserts that Kejuan suffered "incapacity" for more than three consecutive days following his trip to the clinic and recites that Kejuan did not participate in his "normal activities," remained inside the house, and was kept in bed as much as possible. He remained under the care of either his mother or grandmother who administered prescribed medications during "this entire time." During a follow-up visit on July 1, 1997, Dr. Wright prescribed a second ten-day course of antibiotics for Kejuan in an attempt to treat his "persistent ear infection." On July 17, 1997, Kejuan had surgery to remove his adenoids and tonsils and to place tubes in his ears. Following surgery, Kejuan received another course of antibiotics and orders to remain in bed for one week. His mother and grandmother kept him inside following the operation and restricted him from engaging in normal activities.

Caldwell sued and argued that her termination violated the FMLA. On Holland's motion for summary judgment, the district court dismissed the suit because it concluded that, although the Act generally protects employees when their immediate family members have a "serious health condition," Kejuan's condition did not qualify. Caldwell appeals. We reverse and remand.

## II.    DISCUSSION

The FMLA allows eligible employees to take up to a total of twelve workweeks of leave per year for, among other things, "serious health conditions" that afflict their immediate family members.  See 29 U.S.C. § 2612(a)(1)(C) ("to care for the spouse, or son, daughter, or parent, of the employee . . . [who] has a serious health condition"). The employee must show that her family member suffered a serious health condition and that her absence was attributable to the family member's serious health condition. See Frazier v. Iowa Beef Processors, Inc., Nos.  99-1630, 99-1632, 2000 WL 49085, at *4 (8th Cir.  Jan.  19, 2000).

A "serious health condition" occurs, under the regulations, when the family member suffers an "illness, injury, impairment, or physical or mental condition" that requires "inpatient care" or "continuing treatment" by a health care provider.  See 29 C.F.R. § 825.114(a).  Here, the parties agree that Kejuan never received inpatient care. The pertinent issue is whether Kejuan received continuing treatment.  A family member receives continuing treatment if the person experiences "[a] period of *incapacity* . . . of more than three consecutive calendar days" and then receives subsequent treatment, or experiences further incapacity relating to, the same condition.   29 C.F.R. § 825.114(a)(2)(i).  The subsequent treatment must include, either "[t]reatment two or more times by a health care provider . . .," or "[t]reatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider."  29 C.F.R. § 825.114(a)(2)(i)(A)-(B).[2]

_____

[2]The relevant portion of 29 C.F.R. § 825.114(a)(2) reads in its entirety:

(2) *Continuing treatment* by a health care provider.  A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) A period of *incapacity* (*i.e.*, inability to work, attend school or

–4–

The applicability of the FMLA, here, turns on whether Caldwell can prove a two-pronged inquiry: first, she must show that Kejuan suffered "a period of incapacity of more than three consecutive calendar days"; second, she must show that Kejuan subsequently received continued, supervised treatment relating to the same condition. See Thorson v. Gemini, Inc., Nos. 99-1656, 99-2059, 2000 WL 236404, at *2 (8th Cir. March 3, 2000). The district court found, when applying the regulations, that Caldwell "has not provided any proof whatsoever of Kejuan's incapacity for the three days following his June 7 examination." J.A. at 95. Therefore, the district court determined that Caldwell failed to raise a material issue of fact regarding the first prong of her case, namely that Kejuan was not incapacitated for three consecutive days following Caldwell's absence from work on June 7, 1997. Caldwell argues that this finding was error, and we agree. Caldwell has presented sufficient evidence to raise a question of fact as to whether Kejuan's ear infection incapacitated him for more than three days and whether Kejuan then received subsequent treatment for his condition.

In assessing the first prong of Caldwell's case, we note at the outset that the question of what constitutes incapacity of a three-year-old raises an issue not directly addressed by the regulations. The regulations state that incapacity may be determined

---

perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

based on an individual's "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom." See 29 C.F.R. § 825.114(a)(2)(i). Because most three-year-old children do not work or attend school, the standard offered by the regulations is an insufficient guide. The fact finder must determine whether the child's illness demonstrably affected his normal activity. In making this determination, the fact finder may consider a variety of factors, including but not limited to: whether the child participated in his daily routines or was particularly difficult to care for during that period, and whether a daycare facility would have allowed a child with Kejuan's illness to attend its sessions.

Caldwell avers that Kejuan's ear infection, which was severe enough to warrant emergency treatment, required constant care for a period of more than three days. She states in her supplemental affidavit that Kejuan was incapacitated beginning Saturday, June 7, 1997, for more than three consecutive days. She further states:

> He [Kejuan] remained inside the house and was kept in bed as much as possible. He did not participate in any of his normal activities. He was under the constant care of me (his mother) and his grandmother, and both the prescribed medications and a fever reducer were administered to him during this entire time.

J.A. at 89.

In addition to Caldwell's affidavit, the medical records show that Kejuan's ear infection was a continuing, persistent condition that could only be treated by surgery. Kejuan's period of incapacity, therefore, may be measured over the entire time during which he was suffering from this illness and being treated for it. We note that Kejuan was treated for his condition for ten days following his first visit to the emergency

–6–

clinic.[3]  The medical records state that the condition did not improve, and as a result, Dr. Wright, his regular physician, prescribed another ten-day course of antibiotics.[4]  Despite the two medical treatments, Kejuan's condition continued to persist until Dr. Trone, a surgical specialist, performed surgery to remove his tonsils and adenoids on July 17, 1997.  This entire period, from June 7 - July 17, 1997, may constitute Kejuan's period of incapacity if his illness and these various treatments disrupted his basic daily routines, and if, as the record suggests, his ongoing treatment was not successfully alleviating his condition of disability.

The ten-day period beginning on June 7, 1997 could constitute Kejuan's period of incapacity.  As we have noted, his mother's supplemental affidavit refers to constant

---

[3]Dr. Deskin was the treating physician during this first emergency visit.  His medical notes from this first visit state:

IMPRESSION:
Adenoidal hypertrophy and bilateral otitis media [inflammation of the middle ear].

PLAN:
Treat with Neo-Synephrine nose drops q.i.d. for 2 days to try to shrink the adenoidal tissue.  Cefzil 250 b.i.d. [two times per day] for 10 days. Recheck with Dr. Wright his P.C.P. doctor in about 3 weeks for recheck of his ears and further adenoid evaluation.

J.A. at 59-60.

[4]Dr. Wright's notes on July 1, 1997 state:  "IMPRESSION:  Persistent serous otitis, probably due to adenoid hypertrophy. . . .  PLAN:  Amoxil 250 mg. t.i.d. [three times per day] for ten days for persistent ear infection and refer to Dr. Trone for probable T&A."  J.A. at 60.

care and administration of prescribed medications during "this entire time."[5]  The affidavit also refers to the doctor's report which stated that on July 1 Kejuan's condition "was not greatly improved."  All of this evidence indicates a continuing period of incapacity which may have lasted for ten days.

Even if Kejuan did not sustain "incapacity" under the regulations *prior* to his surgery, the record clearly shows that the inflammation and infection in his ears resulted in a period of incapacity that lasted more than three days once he had the tonsillectomy and adenoidectomy.  His mother's affidavit states:

> [T]he doctor stated that [after the operation] Kejuan was to be kept in bed for one (1) week.  Kejuan stayed in bed two or three days but was kept inside the house and did not participate in his normal activities for a week following his surgery.  During this period of time, he was prescribed his third round of antibiotics.

J.A. at 90.  This surgery was the necessary and only treatment for Kejuan's condition. Although Kejuan's condition did not require immediate surgery, after the first round of antibiotics, the doctors determined that the condition could be cured only by surgical operation.

Both the First and the Seventh Circuits have recognized that medical diseases do not afflict people in methodical and predictable ways:  certain serious diseases can elude diagnosis, change in severity, and have cumulative effects on the body over time. See, e.g., Hodgens v. General Dynamics Corp., 144 F.3d 151, 163 (1st Cir. 1998); Price v. City of Fort Wayne, 117 F.3d 1022, 1024-25 (7th Cir. 1997).   These unpredictable characteristics of illness can result in an individual's inability to care for himself and perform his daily tasks, after experiencing a series of less debilitating

---

[5]The phrase "this entire time" relates to the mother's claim that Kejuan was incapacitated "for more than three (3) consecutive days."

symptoms.  In <u>Hodgens</u>, the First Circuit recognized the possibility of FMLA coverage for "intermittent leave":

> [O]ne reason for taking "intermittent leave" under the FMLA would be to visit the doctor for purposes of diagnosis and treatment, even if the employee does not take leave for the periods in between such visits.  It would seem that Congress intended to include visits to a doctor when the employee has symptoms that are eventually diagnosed as constituting a serious health condition, even if, at the time of the initial medical appointments, the illness has not yet been diagnosed nor its degree of seriousness determined. . . . Thus, as long as Hodgens satisfied, at some point in time, the "more than three consecutive days" requirement for establishing a serious health condition, his intermittent absences for less than four days . . . were protected under the FMLA if they were necessary "to determine if a serious health condition exists," . . . or to treat such a condition.  This is true even if the intermittent absences occurred before the consecutive absences.

<u>Hodgens</u>, 144 F.3d at 163 (citation omitted).  This passage reflects the importance of looking at the disease's effects on the body over the entire period of illness.  The Seventh Circuit has even recognized that multiple illnesses, when temporally linked, can result in a serious health condition protected by the FMLA.  <u>See</u> <u>Price</u>, 117 F.3d at 1025 ("how can one's ability to perform at work be seriously impaired by a single serious illness but not by multiple illnesses having a serious impact?  The answer, of course, is that it cannot; the disability is related to the cumulative impacts of illness on one's body and mind.").

FMLA's purpose is to help working men and women balance the conflicting demands of work and personal life.  The law requires courts to consider the seriousness of the afflicted individual's condition because the law was designed to prevent individuals like Juanita Caldwell from having to choose between their livelihood and treatment for their own or their family members' serious health conditions.  Upon

examining the seriousness of Kejuan's ear infection, which required surgery to prevent deafness, we hold that there is at least a question of fact as to whether Kejuan's condition was "serious" under the regulations.

On the second prong of the threshold inquiry, we believe that Caldwell has generated a genuine issue of fact regarding whether Kejuan received "subsequent treatment." By regulation, a plaintiff will show subsequent treatment if the patient merely undergoes "[t]reatment two or more times by a health care provider . . ." or "[t]reatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(a)(2)(i)(A)-(B). Here, after the first ten-day antibiotic treatment, Kejuan was treated by Dr. Wright and later by Dr. Trone in surgery. After visits to both Dr. Wright and Dr. Trone, Kejuan received antibiotic treatments. Furthermore, the record shows at least two post-operative medical visits to monitor Kejuan's condition. Caldwell has presented sufficient evidence of subsequent treatment to defeat summary judgment on this second prong.

An employer does not avoid liability by discharging an employee who takes leave in order to seek treatment for a condition that is later held to be covered by the FMLA. The employer who precipitously fires an employee, when the latter claims the benefits of leave under FMLA, bears the risk that the health condition in question later develops into a serious health condition within the meaning of 29 C.F.R. § 825.114(a).

In our view, a fact finder could determine that Kejuan suffered a serious health condition: his infection caused an acute phase, followed by a course of continuing treatment and disability, requiring further treatment and eventual surgery. While the record does not clearly delineate the nature of the incapacity at all times during this

–10–

extensive period, the evidence does support a fact finding of incapacity extending more than three consecutive calendar days starting on June 7, 1997.[6]

III.  CONCLUSION

For the reasons stated above, the district court erred in granting a summary judgment of dismissal.  Accordingly, we reverse  and remand for further proceedings.

HANSEN, Circuit Judge, dissenting.

I respectfully dissent.

The district court correctly concluded that Kejuan did not have a "serious health condition" as defined by the Family and Medical Leave Act (FMLA).  In this case involving continuing treatment by a health care provider, rather than inpatient care, Kejuan's ear infection would qualify as a "serious health condition" only if it resulted in "[a] period of incapacity . . . of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition . . . . "  29 C.F.R.  §  825.114(a)(2)(i) (emphasis added).  In order to qualify as continuing

---

[6]The dissent argues that Caldwell does not satisfy the regulatory requirement of incapacity for more than three days.  It rests its argument, in part, on a statement during oral argument in which Caldwell's counsel appeared to acknowledge that Caldwell's supplemental affidavit mistakenly characterized Kejuan's incapacity as lasting for "more than three days," when, in fact, Kejuan was only incapacitated for "at least three days."  Juanita Caldwell's supplemental affidavit does state in the third paragraph that Kejuan was incapacitated for "more than three (3) consecutive days."  J.A. at 89.  A narrow interpretation of counsel's statement is not consistent with the record. Furthermore, the lawyer's last statement during the interchange discussed by the dissent shows that he intended to show that Kejuan was incapacitated for more than three days, in conformity with the regulations: "I think the rule is more than three days, in any event he was incapacitated."

treatment, the regulations specifically require an incapacity of more than three consecutive calendar days at the onset of the condition plus subsequent treatment or incapacity.

The record does not support Ms. Caldwell's contention that Kejuan was incapacitated for more than three consecutive days at the time of the onset of the condition. Ms. Caldwell's complaint listed no periods of incapacity. (JA at 1-3). Ms. Caldwell's sworn response to interrogatory number 4, which asked her to list the dates of incapacitation, stated, "June 7, 8, and 9." (JA at 27). Ms. Caldwell's brief in response to Holland's motion for summary judgment stated that Kejuan was incapacitated the week following his July 17 surgery. (JA at 48-51). Likewise, Ms. Caldwell's statement of facts stated he was incapacitated the week following his July 17 surgery. (JA at 52-54). Also, Ms. Caldwell's affidavit alleged Kejuan was incapacitated the week following his surgery. (JA at 55-57). Ms. Caldwell's response to Holland's reply to her response to its motion for summary judgment listed no periods of incapacity. (JA at 76-77). Consequently, the district court noted in its March 18, 1999, order that Ms. Caldwell "provided no evidence that her son was incapacitated for more than three consecutive days during the time period of the June 7 absence as required by the regulations." (JA at 84). The district court ordered Ms. Caldwell "to supplement [her] response to [Holland's] motion for summary judgment with any evidence regarding the incapacity of [Kejuan] immediately following his June 7 examination." (JA at 85). It was not until Ms. Caldwell filed her supplemental affidavit in response to the district court's order that she, for the first time, alleged that her son was "incapacitated beginning Saturday, June 7, 1997, for more than three (3) consecutive days." (JA at 89). Prior to this supplemental affidavit, Ms. Caldwell had alleged that Kejuan was incapacitated only on June 7, 8, and 9, and during the one-week period following his surgery on July 17. Ms. Caldwell made no attempt to amend her sworn answer to interrogatory number 4.

At oral argument, I asked counsel for Ms. Caldwell about the dates of Kejuan's incapacity. The following exchange occurred:

| Judge Hansen: | In your response to interrogatory number 4, which is in the appendix at page 27, you state that this boy was incapacitated on June 7, 8, and 9, but in the supplemental affidavit from your client she states that he was incapacitated beginning on June 7 for more than three days, that's appendix at 89, how do you explain that inconsistency? |
|---|---|
| Counsel: | I guess I should have said at least three days, that's what I was saying, it's at least three days, 7, 8, and 9. |
| Judge Hansen: | Is that what the rule is, at least three days? |
| Counsel: | I think the rule is more than three days, in any event he was incapacitated. Let me move on. |

I respectfully disagree with the court's characterization in footnote 6 of the exchange at oral argument. Clearly, the statement by counsel for Ms. Caldwell was an acknowledgment that the assertion in the supplemental affidavit was incorrect and that it should have stated "at least three days." Counsel's last statement was not an attempt to show conformity with the regulations, as footnote 6 suggests. Counsel's last statement before changing the subject away from the dates of incapacity was an acknowledgment that "at least three days" of incapacity does not meet the FMLA requirement of more than three days of incapacity. Additionally, my interpretation of counsel's concession at oral argument is consistent with the record. Nowhere in the record did Ms. Caldwell ever allege more than three days of incapacity during the time period of the June 7 absence until she was ordered by the district court to offer such evidence. If anything is inconsistent with or in the record, it is Ms. Caldwell's supplemental affidavit. Kejuan's ear infection did not, according to counsel's own

concession, incapacitate him for more than three days at the onset of the condition on June 7. The supplemental affidavit in response to Holland's motion for summary judgment, as qualified by counsel at argument, does not present evidence sufficient to show a <u>genuine</u> dispute of material fact such that a reasonable jury could return a verdict in favor of Ms. Caldwell. <u>See</u> <u>Davis v. Fleming Cos., Inc.</u>, 55 F.3d 1369, 1371 (8th Cir. 1995).

An affidavit submitted in response to a motion for summary judgment which contradicts earlier sworn testimony without explanation of the difference does not create a genuine issue of material fact. <u>See</u> <u>RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.</u>, 49 F.3d 399, 402 (8th Cir. 1995). Here, Ms. Caldwell's supplemental affidavit asserts for the first time that her son was incapacitated for more than three days following the onset of his condition. This statement directly contradicts the sworn interrogatory response that Kejuan was incapacitated only on June 7, 8, and 9. This contradiction in sworn statements is the type of inconsistency that this court warned of in <u>RSBI Aerospace</u>, 49 F.3d at 402 ("[T]his circuit has long held that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment.") (citing <u>Camfield Tires, Inc. v. Michelin Tire Corp.</u>, 719 F.2d 1361 (8th Cir. 1983)).

The court would like to add together Kejuan's incapacity on June 7, 8, and 9, along with his one-week period of incapacity following his July 17 surgery to remove his adenoids and tonsils and to place tubes in his ears, in order to meet the "more than three consecutive calendar days" requirement. Such an interpretation is inconsistent with the language of the regulation. Section 825.114(a)(2)(i) requires a period of more than three days incapacity <u>and</u> subsequent treatment or incapacity. As the court's opinion explains, the applicability of the FMLA relies on a two-pronged inquiry. First, Kejuan must have been incapacitated for a period of "more than three consecutive calender days;" second, Kejuan must have been subsequently treated or incapacitated. Although Kejuan's one-week recovery from his July 17 surgery met the second-prong

"subsequent treatment or period of incapacity relating to the same condition" requirement of § 825.114(a)(2)(i), Kejuan's initial condition did not meet the first-prong requirement of a period "of more than three consecutive calendar" days of incapacity.

The court relies on Hodgens v. General Dynamics Corp., 144 F.3d 151 (1st Cir. 1998), to support its contention that the time period following Kejuan's surgery on July 17 meets the first prong requirement of more than three days of incapacity. However, Hodgens is distinguishable. In Hodgens, the plaintiff suffered from atrial fibrillation, a serious and potentially life-threatening heart condition. Id. at 157. Unfortunately, the doctor was unable to initially diagnose his condition. The plaintiff's first visit to the doctor was on August 4, 1993, but he was not correctly diagnosed until September 21, 1993. Id. During that time period, the plaintiff had numerous doctor's appointments and medical tests to evaluate his condition. Once the plaintiff was correctly diagnosed, the doctor excused the plaintiff from work during the period of September 22 to September 27, 1993. Id. The First Circuit determined that the four-consecutive-day period of September 22 to September 27 met the three-day requirement of § 825.114(a)(2). Id. at 163. Thus, the First Circuit concluded that even the plaintiff's intermittent absences before the diagnosis were protected under the FMLA if the absences "were necessary to determine if a serious health condition exist[ed] or to treat such a condition." Id. (internal citations and quotations omitted). However, only the absences that were actually necessary for the plaintiff to attend medical appointments related to his atrial fibrillation were protected under the FMLA. Id. at 172 ("[A]part from the period from September 22-27, while [the plaintiff's] medical condition clearly did require him to be absent from work . . . for his medical visits, it did not require the vast majority of his absences during August and September.").

Assuming Hodgens is a correct interpretation of the FMLA regulations pertaining to intermittent leave, its conclusion is not applicable to this case. The doctor for Ms. Caldwell's son did not have any difficulty in correctly diagnosing Kejuan's condition. At the initial June 7 visit, the doctor informed Ms. Caldwell that Kejuan suffered from

an acute ear infection and that he would probably require surgery to avoid hearing loss. Although Kejuan's condition may have become a serious health condition at the time of his surgery, Kejuan did not suffer from a serious health condition at the time of his initial doctor's appointment. "[T]he FMLA and its implementing regulations defining 'serious health condition' are not concerned with the potential dangers of an illness but only with the present state of that illness." Seidle v. Provident Mut. Life Ins. Co., 871 F. Supp. 238, 246 (E.D. Pa. 1994) (referring to 29 U.S.C. § 2611(11) and 29 C.F.R. § 825.114).

In contrast, the plaintiff in Hodgens suffered from a serious condition at the time of his initial doctor's appointment, even though the doctor did not know exactly what that condition was. The doctor did, however, recognize that the plaintiff might be suffering from a serious condition, and therefore, the doctor ordered the plaintiff to undergo a series of tests. Hodgens, 144 F.3d at 157. In fact, the doctor initially suspected that the plaintiff might be suffering from angina, "which could be extremely serious or even fatal." Id. The doctor testified that it was reasonable for the plaintiff to stay home from work until he got the results of his stress test. Id. This situation is completely different from Ms. Caldwell's situation as evidenced by the fact that the doctor correctly diagnosed Kejuan's condition, did not order any tests, recommended surgery in the future to correct the problem, and did not suggest that Kejuan should stay in bed or not participate in his normal activities. Certainly there is a distinction between an undiagnosed, potentially life-threatening heart condition and a properly diagnosed and promptly treated ear infection.

Unlike the First Circuit, this court today has greatly expanded the definition of incapacity to include periods of time when a patient is taking antibiotics or if the illness disrupts basic daily routines. The court suggests that Kejuan may have been incapacitated for at least the ten-day period following the onset of the illness during which time Kejuan was taking antibiotics and that he may have been incapacitated for the entire period from June 7 to July 17, an assertion never made even by Ms.

Caldwell. The court has supplanted the express guidance provided by the FMLA regulations with its own view of what constitutes an incapacity. See 29 C.F.R. § 825.114(a)(2)(i) (Incapacity is an "inability to work, attend school or perform other regular daily activities."). In this respect, I reject the court's suggestion that "incapacity" under the FMLA may be defined by the sniffle standards imposed by a local daycare center.

The legislative history of the FMLA indicates that Congress intended the FMLA to apply only to serious health conditions. Congress did not include those "minor illnesses which last only a few days and surgical procedures which typically do not require hospitalization and require only a brief recovery period." Seidle, 871 F. Supp. at 242 (quoting H.R. Rep. No. 103-8, pt. 1, at 29 (1993)). Kejuan's ear infection, up until the point of his surgery, was a minor illness as shown by his not more than three days of incapacity, his improvement on the onset day which allowed his mother to work on the evening of onset (June 7) and to return to work on June 9, the lack of any restrictions placed on him by his doctor, the length of time between his June 7 initial doctor visit and his next follow-up visit on July 1, and the scheduling of his surgery nearly six weeks after the onset of his illness. Ms. Caldwell's one-day absence from work on June 7 to take her son to the doctor is not the type of absence that Congress enacted the FMLA to cover. Congress expected absences for these types of minor illnesses to be covered under an employer's sick leave policy. See id.

Consequently, I would affirm the judgment of the district court because Kejuan did not have a "serious health condition" as defined by the FMLA and its regulations.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

–17–